# In the United States Court of Federal Claims

No. 07-562C

(Filed September 14, 2007)

* * * * * * * * * * * * * * * * * * * * * *   *

  *

**ERINYS IRAQ LTD.,**              *   Contracts; pre-award bid protest;

  *   best value procurement;

          Plaintiff,       *   competitive range determination;

  *   unequal treatment; price realism

    v.              *   and reasonableness; prejudice.

  *

**THE UNITED STATES,**           *

  *

         Defendant,       *

  *

    and             *

  *

**AEGIS DEFENCE SERVICES LTD.,**   *

  *

       Intervenor-Defendant.    *

  *

* * * * * * * * * * * * * * * * * * * * * *   *

      <u>Robert S. Nichols</u>, Washington, DC, for plaintiff.  <u>Angela B. Styles</u>, <u>Elizabeth W. Newsom</u>, <u>Charlotte Gillingham</u>, and <u>Dane Swanson</u>, Crowell & Moring LLP, of counsel.

      <u>Steven M. Mager</u>, Department of Justice, Washington, DC, with whom was <u>Assistant Attorney General Peter D. Keisler</u>, for defendant.  <u>Maj. Christopher L. Krafcheck</u>, U.S. Army, Contract & Fiscal Law Division, of counsel.

      <u>John S. Pachter</u>, Vienna, VA, for intervenor-defendant Aegis Defence Services Ltd. <u>Richard C. Johnson</u>, <u>Johnathan D. Shaffer</u>, and <u>Mary Pat Gregory</u>, Smith Pachter McWhorter PLC, of counsel.

## <u>MEMORANDUM OPINION AND ORDER</u>  <u>1/</u>

**MILLER,** Judge.

_____

    <u>1/</u>  This opinion originally was filed under seal on August 29, 2007.  By ¶ 2 the parties were requested to notify the court of any redactions. All redactions requested are denoted by brackets.

This pre-award bid protest filed by plaintiff Erinys Iraq Ltd. ("plaintiff") is before the court after argument on cross-motions for judgment on the administrative record, as supplemented. Plaintiff seeks a declaratory judgment that the decision of the Joint Contracting Command-Iraq/Afghanistan (the "agency" or "JCC-I/A") to exclude plaintiff from the competitive range for award of the Reconstruction Security Support Services Contract ("RSSS Contract") under Request for Proposals No. W91GXZ-07-R-0004 (the "RFP") was contrary to law and without rational basis. Plaintiff's complaint presents four counts upon which it seeks relief: the agency engaged in irrational price evaluation; the agency engaged in unequal discussions with offerors; the agency engaged in irrational evaluation of the non-price evaluation factors; and the agency engaged in unequal treatment of plaintiff. Plaintiff seeks an order directing the JCC-I/A to reinstate plaintiff to the competitive range, to conduct discussions with plaintiff, and to solicit another round of offers for the RSSS Contract for evaluation.

## PROCEDURAL HISTORY

On January 19, 2007, the JCC-I/A issued the RFP, calling for security services supporting operations and projects by the Gulf Region Division of the U.S. Army Corps of Engineers ("GRD") throughout Iraq. These services include supporting operations of Reconstruction Operations Centers ("ROCs"), providing personal security to GRD and JCC-I/A staff, providing guard services for GRD facilities, providing Reconstruction Liason Teams to evaluate security conditions and construction activity at construction sites, and vetting prospective Iraqi employees of both JCC-I/A and GRD. For the past three years, JCC-I/A and GRD provided such services under two separate contracts. Plaintiff is currently performing one of these two contracts. Plaintiff's incumbent contract is approaching its conclusion. Plaintiff was one of seven offerors that submitted proposals, along with intervenor-defendant Aegis Defence Services Ltd. ("Aegis"); ArmorGroup North America Inc. ("ArmorGroup"); [

].

On April 1, 2007, the JCC-I/A Source Selection Authority (the "SSA"), Col. Joseph A. Bass of the U.S. Army, presented an evaluation of each proposal and announced the agency's decision "that Aegis Defence and Armor Group North America comprise the competitive range." AR Tab 22 at 2407. On April 2, 2007, the JCC-I/A notified plaintiff that it had been excluded from the competitive range for the RSSS Contract. The JCC-I/A provided a written debriefing to plaintiff on April 5, 2007, in a letter by then-Contracting Officer JoAnn M. Townley.

On April 9, 2007, plaintiff filed a bid protest concerning the RFP with the U.S. Government Accountability Office (the "GAO"). On May 18, 2007, the JCC-I/A filed an Agency Report with the GAO. On May 29, 2007, the JCC-I/A informed plaintiff and the GAO that the RFP was also being challenged by Brian X. Scott at the United States Court of Federal Claims in Scott v. United States, No. 07-216C (Fed. Cl. filed Apr. 3, 2007). 2/ On May 31, 2007, the GAO dismissed plaintiff's protest pursuant to 4 C.F.R. § 21.11(b) (2006), on the ground that the RFP that was the subject of plaintiff's protest was "the subject of litigation before a court of competent jurisdiction." AR Tab 36 at 2693.

On June 1, 2007, plaintiff filed an action in the United States Court of Federal Claims protesting its exclusion from the competitive range. That action was captioned Erinys Iraq Ltd. v. United States, No.07-340 (Fed. Cl. filed Jun. 1, 2007) ("Erinys I"). On the same date, plaintiff sought, and this court issued, a temporary restraining order directing defendant not to award the RSSS Contract pending dissolution of the order on June 7, 2007, or a continuation thereof, because the agency had failed to conduct a price realism analysis. During the hearing held on June 7, 2007, on extension of the temporary restraining order, defendant represented that the JCC-I/A intended to take corrective action by setting aside the initial competitive range determination and conducting a new evaluation. For that reason, no objection having been registered by defendant or Aegis, on June 11, 2007, the court dismissed plaintiff's complaint without prejudice.

The JCC-I/A then ordered the new contracting officer, Lt. Col. Mark Wade, to conduct a second evaluation of the seven proposals. On July 18, 2007, the JCC-I/A issued its second evaluation, by which Col. Victoria H. Diego-Allard, the new SSA, determined that Aegis and ArmorGroup comprised the competitive range. On July 22, 2007, the JCC-I/A informed plaintiff of its exclusion from the competitive range.

Following notice of its exclusion from the competitive range for the second time, on July 25, 2007, plaintiff filed the complaint in the instant action. On July 30, 2007, the court granted Aegis's motion to intervene as a matter of right and ordered the parties to file simultaneous cross-motions for judgment on the administrative record.

## FACTS

The Administrative Record (the "AR"), as supplemented, is the source of the following facts. The GRD engages in reconstruction operations throughout Iraq. The JCC-

---

2/ Subsequent to arguments in the instant case, Scott was dismissed for lack of subject matter jurisdiction. Scott, No. 07-216C (Fed. Cl. Aug. 23, 2007).

I/A currently has two different contracts in place, each with a different contractor, to provide the GRD with security services for its reconstruction teams, as well as a variety of support services to facilitate its reconstruction mission. The two incumbent contractors are Aegis and plaintiff. The existing contract with Aegis is a "Cost Plus Fixed-Fee contract." AR Tab 1 at 5. Fiscal year 2006 expenditures under the contract with Aegis were in the amount of $136,054,330.67. The existing contract with plaintiff is an "Indefinite Delivery/Indefinite Quantity (ID/IQ) contract, with Fixed Labor Task Rate Orders." Id. During fiscal year 2006, expenditures under plaintiff's contract totaled $35,799,180.84.

The JCC-I/A expressed a continuing need to provide these reconstruction security support services to the GRD, which included furnishing security for GRD operations, as well as static guard services for GRD facilities and Reconstruction Liason Teams to evaluate security conditions and construction activity at construction sites and vetting prospective Iraqi employees of both JCC-I/A and GRD. The JCC-I/A anticipated that consolidating the contracts would provide some "economies of scale for indirect costs such as safety, training, QA, HR, logistics, etc." AR Tab 1 at 8. The JCC-I/A contemplated that consolidating the contracts would allow for easier administration of the reconstruction security support services and that "[f]ull and open competition [between offerors] may realize some reduction from current prices." Id.

The nature and extent of the reconstruction security support services that the JCC-I/A and GRD required changed considerably over the three years during which these services were being provided under the two separate contracts. The JCC-I/A noted that "[t]hese refinements came at a price. For example, the contract with Aegis was modified more than 70 times and the [Erinys] contract was modified more than 15 times." AR Tab 1 at 9. While the JCC-I/A was now "reasonably certain" that it knew "the broad scope" of its requirements, it remained "unable to estimate, with a reasonable certainty, how much services will be needed nor when services will be needed." Id. For this reason the JCC-I/A concluded that an Indefinite Delivery/Indefinite Quantity ("ID/IQ") contract with Fixed Labor Rate task orders would "provide a solution to service level uncertainty." Id. The JCC-I/A determined that such an ID/IQ contract would best serve its needs because

> [a]n ID/IQ contract will establish unit prices and the broad scope requirements that can be ordered Fixed Labor Rate task orders will specify the service levels needed. Performance-price tradeoff will be performed for each task order award.

> A Positive Performance Incentive Plan will be incorporated in the contract. The incentive plan will apply to [Security Escort Team] services and

[Reconstruction Liasom Team] services as these are the two [contract line item numbers] that impact the safety of GRD and [JCC-I/A] staff.

Id.

The JCC-I/A prepared a procurement strategy and acquisition strategy/plan, which was approved on January 17, 2007.  In the Source Selection Plan, the JCC-I/A announced its acquisition strategy:

> This is a competitive acquisition for an Indefinite Delivery/ Indefinite Quantity (ID/IQ) contract with Fixed Labor Rate Task Orders.  The period for ordering task orders will be 12 months and there will be an option of 12 months making the maximum potential contract period 24 months.  The Contracting Officer has determined circumstances peculiar to the requirements of this procurement action warrant awarding one ID/IQ contract.

> The acquisition is being conducted in accordance with FAR Part 15, Contracting by Negotiation.  Award will be made to the best overall proposal, which is determined to be the most beneficial to the Government (Best Value).

AR Tab 3 at 66.

The RFP called for evaluation on price and five technical factors: Management Approach, Technical Approach, Past Experience, Past Performance, and Socioeconomic. The terms of the RFP contemplated that the Source Selection Evaluation Board (the "SSEB") was to evaluate

> each proposal in relation to each factor, and then . . . give a consensus rating. Each factor, with the exception of price, will receive a rating, and then there will be an overall roll-up rating of the proposal as a whole. The overall evaluation of the offeror's capability to perform shall be based on all the evaluation factors . . . .

Id.  In evaluating the relative importance of each of these factors, "[e]ach of the technical factors are of equal importance relative to each other. All technical factors combined are significantly more important than price."  Id.

Prospective offerors were directed to prepare their bids according to a set of specifications set forth in the RFP.  These specifications described the substantive elements that offerors were to include in their proposals and included instructions on how to organize

5

a proposal.   The instructions also directed prospective offerors to include specified information in particular files.  Prospective offerors were instructed to prepare six such files – one file for each technical factor and one file for price.  The instructions also required, for inclusion in each file, the "[i]dentification and explanation of any exceptions or deviations" and instructed that "[a]ny assumptions used in the proposal presentation . . . be identified." AR Tab 4 at 128, 129, 131, 132, 133.

The contract was to be awarded to the proposal that provided the Government with the best value, based on an evaluation of each of these files in accordance with section M of the RFP.   See AR Tab 4 at 134-39.   The RFP elaborated further on the meaning of "best value:"

> M.1.1 Award will be made to the offeror whose proposal represents the best value to the Government.   Offerors were advised that the Government seeks proposals, which demonstrate the greatest management and technical ability and the greatest benefit to socioeconomic well being of Iraq businesses and employees at a reasonable, realistic, and affordable price based on the evaluation factors listed below.   Evaluated price will be compared to management and technical competence and socioeconomic impacts.   A price/technical tradeoff will be conducted to determine which offer represents the overall best value to the Government.  The Government reserved the right to make an award to other than the lowest-priced offeror or to other than the offeror with the best technical evaluation if the Contracting Officer determines that to do so would result in the best value to the Government.

> M.1.2 Award may be made without discussions.   However, in accordance with FAR Sub-part 15.306(a)(1) & (2) some clarifications may be required. In accordance with FAR Sub-part 15.306(a)(3), the Government reserves the right to hold discussions if it is determined that discussions are necessary. Should the number of proposals exceed the number at which an efficient competition can be conducted; the Contracting Officer will establish the competitive range.

AR Tab 4 at 134.

In its evaluation of the proposals for the second competitive range determination, the SSA rated each proposal on its technical factors by assigning an adjectival rating.  For technical factors 1, 2, 3, and 5 (Management Approach, Technical Approach, Past Experience, and Socioeconomic, respectively), the SSA used the following adjectival ratings:

| Color | Definition |
|-------|------------|
| Blue | A proposal that satisfies all of the Government's requirements with extensive detail to indicate feasibility of the approach and shows a thorough understanding of the problems and offers numerous significant strengths, which are not offset by weaknesses, with an overall low degree of risk in meeting the Government's requirements. |
| Green | A proposal that satisfies all of the Government's requirements with adequate detail to indicate feasibility of the approach and shows an understanding of the problems and offers some significant strengths or numerous minor strengths, which are not offset by weaknesses, with an overall low to moderate degree of risk in meeting the Government's requirements. |
| Yellow | A proposal that satisfies all of the Government's requirements with minimal detail to indicate feasibility of the approach and shows a minimal understanding of the problems, with an overall moderate to high degree of risk in meeting the Government's requirements. |
| Orange | A proposal that satisfies all of the Government's requirements with minimum detail to indicate feasibility of approach and shows a minimal understanding of the problem with an overall high degree of risk in meeting the Government's requirement[s]. |
| Red | A proposal that contains a major error(s), omission(s) or deficiency(ies) that indicates a lack of understanding of the problems or an approach that cannot be expected to meet requirements or involves a very high risk; and none of these conditions can be corrected without a major rewrite or revision of the proposal. |

AR Tab 41 at 2795. In rating technical factor 4, Past Performance, the SSA used the following adjectival ratings:

| Color | Definition |
|-------|------------|
| Blue | Little doubt exists, based on the Offeror's performance record, that the Offeror can perform the proposed effort. |
| Green | Some doubt exists, based on the Offeror's performance record, that the Offeror can perform the proposed effort. |

| Color | Definition |
|-------|------------|
| Orange | Significant doubt exists, based on the Offeror's performance record, that the Offeror can perform the proposed effort. |
| Red | Extreme doubt exists, based on the Offeror's performance record, that the Offeror can perform the proposed effort. |
| Yellow | No relevant performance record identifiable; equates to an unknown risk rating having no positive or negative evaluation significance. |

Id. at 2796.  These adjectival ratings were to be assigned based on the evaluation criteria established in section M of the RFP.

The RFP directed the JCC-I/A to evaluate price proposals for "completeness, reasonableness, and realism."  AR 4 at 139.  The JCC-I/A defined these three terms in the RFP:

> (1) Completeness: To be complete, the offeror must provide all the data that is necessary to support the proposal. The Government will evaluate the extent to which the price proposal complies with the content and format requirements set forth in this solicitation and exhibits traceability of estimates.

> (2) Reasonableness: The offeror's proposed prices will be evaluated to determine any unreasonably high or low prices in relation to the offeror's technical proposal.

> (3) Realism: Proposed prices will be evaluated to determine if the prices are realistic for the work to be performed, reflect a clear understanding of the requirements, and are consistent with the unique methods of performance and materials described in the offeror's proposal.

> If an Offeror's price is evaluated as unrealistically low or high compared to the anticipated price of performance and/or the offeror fails to recognize and/or mitigate management, technical, schedule, and price risks, the Government will reflect the inherent findings, risks, and associated price impacts in the Price Realism Analysis as well as in the appropriate Factor within the Technical proposal. A proposal in which prices proposed are unrealistically low for the effort proposed may cause that proposal to no longer be considered for award.  The Government will evaluate price proposals to determine whether the offered price reflects a sufficient understanding of the contract requirements and the risk inherent in the offeror's approach.

8

Proposals found to have an unrealistic price may be deemed to be unacceptable and may not receive further consideration. Price will also be a factor in establishing the competitive range prior to discussions (if held) and in making the final best value determination for award.

Id. The price evaluation would include an analysis of "unit prices, total proposed prices, performance incentive rates and maximum performance incentive amounts, for the basic performance period and all option periods." Id. The RFP also noted that "[p]rice realism analysis will be a separate review and evaluation of the proposed price to determine the degree to which an offeror proposes realistic prices." Id.

In the SSA's second determination of the competitive range, plaintiff was excluded from the competitive range. On July 22, 2007, the JCC-I/A informed plaintiff of its exclusion from the competitive range. Plaintiff then filed its complaint in the present action protesting this exclusion and alleged four counts upon which relief should be granted. In its first count, plaintiff claims that the JCC-I/A's price evaluation was flawed because "the [JCC-I/A] failed to perform a proper price realism analysis" in evaluating the prices of each offeror's proposal. Am. Compl. filed Aug. 22, 2007, ¶ 47; see id. ¶¶ 47-52. Plaintiff also asserts that the JCC-I/A's price reasonableness analysis was flawed. For these reasons plaintiff asserts that "[the JCC-I/A's] price evaluation . . . was arbitrary, capricious, an abuse of discretion, and not in accordance with the law." Id. ¶ 85.

In its second count, plaintiff claims that the JCC-I/A engaged in unequal discussions with Aegis and ArmorGroup after the JCC-I/A made its determination of the competitive range. See id. ¶¶ 54-60. Plaintiff alleges that such determinations prejudiced plaintiff and made the JCC-I/A's evaluation "arbitrary, capricious, an abuse of discretion, and not in accordance with the law." Id. ¶ 89.

The third count claims that the JCC-I/A's determination of the non-price technical factors was irrational. See id. ¶¶ 61-69. In its fourth count, plaintiff claims that the JCC-I/A engaged in other unequal treatment of plaintiff. See id. ¶¶ 70-77. Plaintiff alleges that these actions were "arbitrary, capricious, an abuse of discretion, and not in accordance with the law." Id. ¶¶ 92, 95.

## DISCUSSION

I. Standard of review

The United States Court of Federal Claims has jurisdiction over actions brought by disappointed offerors in a government procurement pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1) (2000), as amended by the Administrative Disputes Resolution Act of 1996,

Pub. L. No. 104-320, § 12(a), 110 Stat. 3870, 3874-75 (codified at 28 U.S.C. § 1491(b)) (the "ADRA").

1. Standing

_____Standing is a threshold matter that every plaintiff must establish in order to invoke the court's jurisdiction. Sicom Sys., Ltd. v. Agilent Techs., Inc., 427 F.3d 971, 975 (Fed. Cir. 2005). In 1996 Congress clarified the court's bid protest jurisdiction when it passed the ADRA, 28 U.S.C. § 1491(b)(1) (2000). This statute provides the United States Court of Federal Claims with jurisdiction

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

Id. The Federal Circuit considered the scope of this revised jurisdicitonal grant in American Federation of Government Employees v. United States, 258 F.3d 1294, 1298 (Fed. Cir. 2001) ("AFGE"), concluding that the term "interested party" of section 1491(b)(1) should be construed "in accordance with the [Competition in Contracting Act,]" 31 U.S.C. § 3551(2) (2000). AFGE, 258 F.3d at 1302.

The relevant portion of the Competition in Contracting Act defines an interested party as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551(2) (2000). Courts construing the second element, the "direct economic interest" prong, have done so narrowly, "guided by the principle that waivers of sovereign immunity . . . are to be construed narrowly." AFGE, 257 F.3d at 1301. An actual or prospective bidder demonstrates that it has a direct economic interest by showing that, absent the alleged agency error, a "substantial chance" exists that it would have received the contract award. See Bannum, Inc. v. United States, 404 F.3d 1346, 1353 (Fed. Cir. 2005); see also Myers Investigative and Security Serv., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (prejudice requirement for standing satisfied by showing that protestor "could compete for the contract.").

2. Standard of review of a bid protest in a negotiated procurement

In evaluating an agency procurement decision, the ADRA prescribes the standard of review set forth in the Administrative Procedure Act, 5 U.S.C. § 706 (2000) (the "APA").

10

See 28 U.S.C. § 1491(b)(4) (2000); Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004). The APA gives the court discretion to set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see PGBA, LLC v. United States, 389 F.3d 1219, 1224-28 (Fed. Cir. 2004) (clarifying that ADRA incorporated arbitrary and capricious standard of APA as standard of review, but did not alter court's equitable discretion in granting remedy of injunctive relief).

Even if a disappointed bidder can show that the agency's conduct violated the APA standard, not all violations of this standard entitle a disappointed bidder to relief. The bidder also must show that it actually was prejudiced by that agency conduct. 3/ For this reason the Federal Circuit has directed that

> [a] bid protest proceeds in two steps. First, . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second, . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

---

3/ In order to establish standing, a disappointed bidder must show that it has a "direct economic interest [that] would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551(2) (2000). See Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006). This requirement contemplates a showing of prejudice. See Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003). Showing prejudice is also an essential element of success on the merits. See Banknote, 365 F.3d at 1351. The prejudice requirement for standing generally has been satisfied by the mere showing that a protestor "could compete for the contract," Myers, 275 F.3d at 1370, but the threshold showing of prejudice required for success on the merits generally is higher. See, e.g., Galen Med. Associates v. United States, 369 F.3d 1324, 1330-31 (Fed. Cir. 2004) (prejudice not found when protestor could not meet requirements of solicitation because it lacked the requisite facilities); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1563 (prejudice not shown when, despite pricing error, protestor's prices remained substantially higher). It is possible to satisfy both of these standards with the same demonstration of a "substantial chance" of receiving the award, but for the alleged error, if that demonstration satisfies the more stringent standard for showing prejudice on the merits. See Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999). These standards are not identical, however.

11

Bannum, 404 F.3d at 1351.  The plaintiff bears the "heavy burden" of proving a lack of rational basis or a violation of the law by a preponderance of the evidence.  Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1333 (Fed. Cir. 2001) ("Domenico Garufi").

Agency action is arbitrary or capricious when it lacks any rational basis.  For an agency action to be grounded on some rational basis, "'the contracting agency [must] provide[] a coherent and reasonable explanation of its exercise of discretion.'"  Id. at 1332 (quoting Saratoga Dev. Corp. v. United States, 21 F.3d 445, 456 (D.C. Cir. 1994)).  An agency is generally entitled to wide discretion in its evaluation of bids.  Grumman Data Sys. Corp. v. Widnall, 15 F.3d 1044, 1046 (Fed. Cir. 1994).  In a bid protest context, the court's role is not to substitute its judgment for that of the agency; rather, it should defer to the agency's analysis so long as it has substantial basis in fact.  See id.; see also Camp v. Pitts, 411 U.S. 138, 142-43 (1973) (in reviewing agency decisions, courts should not engage in decision-making process anew, but instead review facts to determine if agency's decision is supported by rational basis).

In particular, technical ranking decisions made by the agency are "minutiae of the procurement process . . . , which involve discretionary determinations of procurement officials that a court will not second guess."  E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996); see also Fed. Power Comm'n v. Fl. Power & Light Co., 404 U.S. 453, 463 (1972) (courts recognize technical experience of relevant agency and defer to analysis unless without substantial basis in fact).  Where the procurement in question is a negotiated "best value" procurement, as it is in this case, AR Tab 4 at 134, "the protestor's burden of proving that the award was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law is greater than in other types of bid protests."  Galen Med. Assocs. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004).  Because a contract award based on "best value" takes more than price into consideration, "the contracting officer [has] even greater discretion than if the contract were to have been awarded on the basis of cost alone."  Id.

Agency procurement procedures that are contrary to applicable laws and regulations also violate the APA standard.  5 U.S.C. § 706(2)(A); Bannum, 404 F.3d at 1351; Domenico Garufi, 238 F.3d at 1335.  Federal law requires that an agency "evaluate . . . competitive proposals and make an award based solely on the factors specified in the solicitation."  10 U.S.C. § 2305(b)(1) (2000).  An agency has no discretion regarding the mandate of applicable laws and regulations.  It is irrelevant whether the agency views the regulation or requirement of the solicitation as important.  Where the agency establishes mandatory requirements or procedures in its RFP, it is bound strictly by those terms "'regardless of [the evaluation group's] view of the appropriateness of the standard'" established in the RFP.

<u>Alfa Laval</u>, 175 F.3d at 1367-68 (quoting <u>Alfa Laval Separation, Inc. v. United States</u>, 40
Fed. Cl. 215, 220 (1998), *rev'd on other grounds* 175 F.3d 1365 (Fed. Cir. 1999)).

3. <u>Standard of review for judgment on the administrative record</u>

The parties filed cross-motions for judgment on the administrative record pursuant to
RCFC 52.1. RCFC 52.1 provides a procedure for expedited trial on a "paper record,
allowing fact-finding by the trial court." <u>Bannum</u>, 404 F.3d at 1356. Unlike a motion for
summary judgment, a genuine dispute regarding a material fact will not preclude a judgment
on the administrative record. <u>See id.</u> The parties are restricted to the agency record and any
supplementation consistent with RCFC 52.1. The court must make its findings of fact from
this record as if it were conducting a trial. <u>Id.</u> at 1357. In certain circumstances the
administrative record may be supplemented. <u>Domenico Garufi</u>, 238 F.3d at 1338
(supplementation appropriate where "required for meaningful judicial review"). <u>4/</u>

4. <u>Standards for obtaining injunctive relief</u>

Plaintiff asks for an injunction preventing the JCC-I/A from making any contract
award during the pendency of this action, <u>5/</u> an order requiring the JCC-I/A to engage in an
new evaluation of proposals, and a new determination of the competitive range. Am. Compl.
pp. 31-32. In a bid protest action, the Court of Federal Claims has the power to grant
injunctive relief. 28 U.S.C. § 1491(b)(2). The award of injunctive relief is an
"extraordinary" one to be granted only in limited circumstances. <u>John C. Grimberg Co., Inc.</u>
<u>v. United States</u>, 702 F.2d 1362, 1372 (Fed. Cir. 1983). In order to obtain an injunction, a
protestor must demonstrate by a preponderance of the evidence that (1) it succeeds on the

---

<u>4/</u> Defendant moved to supplement the administrative record with additional relevant
documents on August 6, 2007. The court granted this motion on the same date.

<u>5/</u> Plaintiff's original complaint in this action did not include this request for a
preliminary injunction, nor any allegations relating to satisfying the requirements for granting
injunctive relief. In the previous action before the court, <u>Erinys I</u>, plaintiff sought a
temporary restraining order. Motion of Plaintiff Erinys Iraq Limited for a Temporary
Restraining Order and/or Preliminary Injunction, filed Jun. 1, 2007, <u>Erinys I</u>, No. 07-340.
During argument for judgment on the administrative record in this case, the court recognized
that the record did not indicate whether and to what extent these showings in <u>Erinys I</u> would
apply to the instant action. Transcript of Proceedings, <u>Erinys Iraq Ltd. v. United States</u>, No.
07-562, at 88 (Fed. Cl. Aug. 21, 2007) ("Tr."). For this reason the court allowed plaintiff the
opportunity to amend its complaint to include its requests for injunctive relief and to support
these requests with the appropriate allegations. <u>See</u> Order entered Aug. 21, 2007, ¶ 1.

merits; (2) it will suffer irreparable harm if injunctive relief is not granted; (3) the harm to plaintiff if an injunction is not granted outweighs the harm to the Government if an injunction is granted; and (4) the injunction is not against the public interest.  PGBA, 389 F.3d at 1228-29; FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993); see U.S. Ass'n of Importers of Textiles & Apparel v. United States, 413 F.3d 1344, 1346 (Fed. Cir. 2005).

II.  Success on the merits

Plaintiff has standing to pursue this action because it was an actual bidder in this solicitation, and because its direct economic interest would be affected by the award of the contract or by failure to award the contract  To demonstrate success on the merits, plaintiff must prove either that the JCC-I/A acted without a rational basis when it excluded plaintiff from the competitive range or that the agency action constituted "a clear and prejudicial violation of the applicable statutes or regulations."  Domenico Garufi, 238 F.3d at 1333.  In addition, plaintiff must prove that the JCC-I/A's actions prejudiced plaintiff.  "[I]f the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protestor was prejudiced by that conduct."  Bannum, 404 F.3d at 1351. "[T]he prejudice determination assesses whether an adjudged violation of law warrants setting aside of [the agency determination]."  Id. at 1357.

Plaintiff attacks the solicitation on three major grounds.  First, plaintiff alleges that the JCC-I/A's price evaluation was irreparably flawed, irrational, counter to the RFP, and arbitrary and capricious.  Plaintiff next argues that SSEB engaged in improper discussions with Aegis and ArmorGroup that improperly favored one offeror over another in violation of 48 C.F.R. (FAR) § 15.306(e)(1).  Finally, plaintiff argues that the JCC-I/A evaluated a variety of non-price factors in an irrational manner and that this evaluation was also the product of unequal treatment.  Of these three arguments, the attack on the JCC-I/A's price evaluation is the most substantial; because the latter two arguments can be considered with comparative brevity, the court will address them first.

1.  The non-price factors were the basis for excluding plaintiff from the competitive range

The RFP called for an evaluation of five technical factors: Management Approach, Technical Approach, Past Experience, Past Performance, and Socioeconomic, as well as price.  In evaluating the relative importance of each of these factors, "[e]ach of the technical factors are of equal importance relative to each other.  All technical factors combined are significantly more important than price."  AR Tab 4 at 134.  Plaintiff contends that "the Record demonstrates that the evaluation of the nonprice factors was also irrational, contrary

14

to the RFP and/or unsupported by the Record, and/or the result of unequal treatment." Pl.'s Br. filed Aug. 10, 2007, at 29.

The record shows expressly, however, that the JCC-I/A did not exclude plaintiff from the competitive range because of plaintiff's technical ratings. In the JCC-I/A's Final Competitive Range Determination dated July 21, 2007, the SSA provided a narrative describing each offeror's technical ratings, the reasons for assigning each offeror a particular technical rating, and a description of each offeror's strengths and weaknesses. This narrative included a summary describing the SSA's evaluation of plaintiff's proposal and reasons for excluding it from the competitive range:

> The agency found that Erinys'[s] proposal satisfied all the agency's requirements with adequate detail to indicate a feasible approach. Erinys'[s] proposal offered an overall low to moderate degree of risk in meeting the requirements. <u>These ratings and a lower price would have placed Erinys in the competitive range</u> however, Erinys offered the highest price of all offers – more than [   ] higher than the average of all offers – nearly double the price of all the offerors included in the competitive range.

AR Tab 41 at 2854 (emphasis added). Plaintiff recognized as much in its motion for judgment on the administrative record. See Pl.'s Br. filed Aug. 10, 2007, at 29 ("It is clear from the Record that the Agency's price evaluation was the sole cause for the Agency's decision to exclude Erinys from the competitive range.").

Even assuming, *arguendo*, that every action by the JCC-I/A that plaintiff considers a violation of the APA standard actually constitutes a violation, plaintiff still must show that it was prejudiced by these violations. <u>Bannum</u>, 404 F.3d at 1351. Thus, the record must support a finding that the JCC-I/A's flawed evaluation of plaintiff's technical proposal precluded plaintiff from having a substantial chance of being awarded the contract; *i.e.*, that these technical ratings led to plaintiff's exclusion from the competitive range. In this case no such showing is possible, because the JCC-I/A acknowledges that "[t]hese ratings and a lower price would have placed Erinys in the competitive range." AR Tab 41 at 2854.

## 2. <u>The JCC-I/A did not engage in unequal or improper discussions</u>

Plaintiff complains that members of the SSEB engaged in discussions with, and evaluated proposal revisions from, Aegis and ArmorGroup without according equal treatment to plaintiff in violation of FAR 15.306(e)(1). FAR 15.306(e)(1) prohibits agencies from using discussions to engage in conduct that "[f]avors one offeror over another." FAR 15.306(e)(1). The record shows that members of the SSEB discussed topics, including

"proposed management approach, technical approach, socioeconomic, and price proposals" with both Aegis and ArmorGroup. AR Tab 23 at 2409; AR Tab 24 at 2410. The timing of these discussions, however, is relevant. These discussions occurred after the first establishment of the competitive range. See AR Tab 22 (first competitive range established April 1, 2007); AR Tab 23-24 (letters dated April 2, 2007). The FAR directs agencies to "evaluate all proposals . . . and, if discussions are to be conducted, establish the competitive range." FAR 15.306(c)(1). After establishing the competitive range, agencies are free to engage in discussions with offerors to

> [allow] the offeror to revise its proposal. These [discussions] may include bargaining. Bargaining includes persuasion, alteration of assumptions and positions, give-and-take, and may apply to price, schedule, technical requirements, type of contract, or other terms of a proposed contract.

FAR 15.306(d). In a competitive acquisition, such as the one in the case at bar, these discussions "take place after establishment of the competitive range." Id.; see Information Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1321-22 (Fed. Cir. 2003). The discussions with Aegis and ArmorGroup occurred only after the SSA had established the competitive range. Although the competitive range determination was set aside in Erinys I, the timing of those discussions was proper; and, pursuant to the FAR, the JCC-I/A was not obligated to engage in such discussions with any offeror not in the competitive range. See FAR 15.306(d).

After the first determination of the competitive range and plaintiff's first protest in Erinys I, the JCC-I/A agreed to set aside the competitive range determination and engage in a new determination. For the second competitive range determination, the JCC-I/A appointed Lt. Col. Wade as Contracting Officer and Col. Diego-Allard as the new SSA. Plaintiff views the second competitive range determination as improperly tainted by the first-round post-competitive range determination discussions that the JCC-I/A conducted with Aegis and ArmorGroup. Plaintiff frames its challenge, as follows: "Throughout this procurement, Ms. Margaret Jones has been the Chair of the SSEB, and Mr. David Ziemba has been a cost/price advisor to the SSEB." Pl.'s Br. filed Aug. 10, 2007, at 23. As cost/price advisor to the SSEB, Mr. Ziemba was involved in the discussions with Aegis and ArmorGroup following the first competitive range determination and was involved in the subsequent proposal revisions. Both Ms. Jones and Mr. Ziemba remained involved in the solicitation process through the second competitive range determination. According to plaintiff, both Ms. Jones and Mr. Ziemba communicated with the newly appointed Contracting Officer and SSA. Plaintiff views these discussions as "fundamentally unfair because it would be impossible for Ms. Jones and Mr. Ziemba to objectively forget what was learned during discussions." Pl.'s Br. filed Aug. 17, 2007, at 24.

In order to succeed in its argument that the Ms. Jones or Mr. Ziemba led the JCC-I/A improperly to rely on information that they gleaned from discussions following the first competitive range determination when engaging in the second competitive range determination, defendant would have plaintiff meet a daunting burden of proof.  The Government is presumed to act without bad faith.  Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1240 (Fed. Cir. 2002).  The standard for demonstrating "well-nigh irrefragable proof," urged by defendant, is high, as it refers to "evidence that cannot be refuted or disproved."  Id. at 1240 (internal quotation omitted).

> As with the clear and convincing standard, the requirement of "well-nigh irrefragable proof" also sets a high hurdle for a challenger seeking to prove that a government official acted in bad faith: In the cases where the court has considered allegations of bad faith, the necessary "irrefragable proof" has been equated to evidence of some specific intent to injure the plaintiff.

Id.

The Court of Federal Claims has suggested, in two published opinions since 2005, (Judge Wolski's being much more extensive than that of the undersigned), that

> [t]he Government's long touted desideratum that "irrefragable proof" is needed to demonstrate the absence of good faith in the administration of government contracts has been given its last rites.  *See Tecon*, 66 Fed. Cl. at 766[-67 &] n.36.

H & S Mfg., Inc. v. United States, 66 Fed. Cl. 301, 310 n.19 (2005).  In select cases, however, the indicted government act amounts to charges of misconduct.  See, e.g., Textron, Inc. v. United States, 74 Fed. Cl. 277, 293 (2006) (procurement officials accused of disclosing sensitive government information to competitors).  Setting a "high hurdle," Am-Pro Protective Agency v. United States, 281 F.3d 1234, 1240 (Fed. Cir. 2002) (quoted in Textron, 74 Fed. Cl. at 293), makes sense in those limited circumstances.

The court construes plaintiff's assignment of error not as an indictment of the evaluators' conduct, but as an agency act that is alleged to have been arbitrary, *i.e.*, plaintiff does not accuse the evaluators of misfeasance or malfeasance, but as disqualified from proceeding because of the presumed taint of prior proceedings.  However, plaintiff cannot substantiate that either evaluator carried over into his or her second competitive range determination any tainted knowledge from the first.  The discussions following the first competitive range determination were proper under the FAR.  See FAR 13.506(c)(1); FAR 13.506(d)(1).  The record demonstrates that Mr. Ziemba's communications to Contracting

Officer Lt. Col. Wade concerned pricing of only the initial proposals, not revised pricing information. Nothing in the record supports plaintiff's assertion that Ms. Jones provided Lt. Col. Wade or Col. Diego-Allard with any information from Aegis's or ArmorGroup's revised proposals. Moreover, Ms. Jones's email communications to Lt. Col. Wade that plaintiff posits to have contained this information were sent on July 21 and July 23, three and five days, respectively, after the July 18 determination of the second competitive range.

For these reasons, plaintiff has failed to show that the JCC-I/A engaged in any unequal or improper discussions that might have prejudiced plaintiff.

### 3.  The JCC-I/A's price evaluation

The central issue in this bid protest has been identified as whether the JCC-I/A engaged in a proper price evaluation, because the JCC-I/A acknowledged that plaintiff was excluded from the competitive range solely due to its price. See AR Tab 41 at 2854 ("These [technical] ratings and a lower price would have placed Erinys in the competitive range."). The price evaluation contemplated by the RFP involved an analysis of "unit prices, total proposed prices, performance incentive rates and maximum performance incentive amounts, for the basic performance period and all option periods." AR Tab 4 at 139. The RFP directed the JCC-I/A to evaluate price proposals for "completeness, reasonableness, and realism." Id. Plaintiff's attacks on the JCC-I/A's price evaluation are threefold. First, plaintiff alleges that the JCC-I/A did not engage in separate or proper price reasonableness and realism analyses. Second, plaintiff alleges that the JCC-I/A did not engage in a meaningful price comparison within the terms of the RFP. Finally, plaintiff alleges that the JCC-I/A improperly excluded plaintiff from the competitive range because it did not treat plaintiff's incentive fee proposal as required by the RFP.

#### 1)  The JCC-I/A engaged in proper price reasonableness and price realism analyses.

Plaintiff charges that the JCC-I/A has not engaged in a meaningful price realism analysis. In particular, plaintiff criticizes the agency for ignoring "red flags" in its competitors' proposals and for engaging in what it deems to be a cursory analysis. Pursuant to the RFP, the purpose of price realism analysis was "to determine if the prices are realistic for the work to be performed, reflect a clear understanding of the requirements, and are consistent with the unique methods of performance and materials described in the offeror's proposal." AR Tab 4 at 139. Although the FAR provides a set of tools and baseline procedures that agencies should use and follow when engaging in price analysis for reasonableness, the FAR is silent on how to conduct a price realism analysis. See FAR 15.404-1. Generally, "the nature and extent of an agency's price realism analysis are matters

within the agency's discretion." <u>Labat-Anderson Inc. v. United States</u>, 50 Fed. Cl. 99, 106 (2001).

This solicitation was for an ID/IQ contract, which calls for the offerors to propose unit prices for each position required by the RFP as a contract line item ("CLIN"). Offerors also propose a suggested quantity for each CLIN that they expect will be necessary to fulfill the contract requirements. The details of the contract requirements for each CLIN are explored in considerable detail in the Performance Work Statement (the "PWS") that formed part of the solicitation. AR Tab 4 at 140-228; <u>see also</u> AR Tab 6 at 277-374 (first amended PWS); AR Tab 8 at 412-507 (second and final amended PWS). Each offeror was directed to provide, in its Technical Approach Proposal, detailed information about its staffing plan "that clearly depicts the total number of productive labor-hours and associated full-time equivalent (FTE) positions for each proposed labor category crosswalk to each third-level PWS paragraph in the PWS." AR Tab 4 at 129. An offeror was required to "address task requirements to the fourth level of the PWS," <u>id.</u>, and directed to prepare a compliance matrix for each file in its proposal that would help the JCC-I/A in the source evaluation process. These compliance matrices were to cross-reference titles of proposal sections, CLINs, PWS paragraphs, RFP sections, and proposal page numbers and/or sections in order to assist the SSEB in providing recommendations to the SSA and the SSA in evaluating each offeror. <u>Id.</u> at 127-28.

The extensive information available to the SSA allowed for price realism to be determined in a rational manner. The SSA's second determination of the competitive range included a narrative describing each offeror's price realism. <u>See</u> AR Tab 41 at 2796-2852. The SSA noted that "the new contracting officer [Lt. Col. Wade] ensured a separate Price Realism Analysis was performed and documented in a report to me, the Source Selection Authority (SSA)." <u>Id.</u> at 2792. Seven offerors provided proposals. Of those seven, five provided prices that were considered realistic (Aegis, ArmorGroup, [          ], and plaintiff). Two offerors, [                    ], did not propose prices that were realistic. For example, in her analysis of [        ] proposal, the SSA noted that, while [      ] unit prices were realistic, its total price for the option period was not.

> [          ] . . . . offered price for the option period . . . was considered unrealistic. The offered quantity for CLIN 1002AA, SET Members is [   ] less than the quantity offered for the base year. SET Teams are an integral part of the contract requirement. The SET Team provides security to GRD personnel when in-country travel is required. [        ] assumption for [        ] the level of effort for this CLIN is unrealistic and demonstrates a lack of understanding of the contract requirement.

AR Tab 41 at 2842.  Similarly, in her analysis of [                    ] proposal, the SSA noted that both its unit prices and total proposed prices were unrealistic because "[t]heir proposed prices do not include Iraq taxes on wages for Iraqi staff."  Id. at 2851.  In both instances prices were deemed unrealistic when, upon an analysis of the unit prices and the total unit prices, the SSA determined that prices were not "realistic for the work to be performed," or did not "reflect a clear understanding of the requirements," or were not "consistent with the unique methods of performance and materials described in the offeror's proposal."  AR Tab 4 at 139.

By contrast, the SSA determined that Aegis's, ArmorGroup's, and plaintiff's prices were all realistic.  See AR Tab 41 at 2804, 2812, 2835.  Plaintiff asserts that the JCC-I/A's determination of price realism was improper because it did not engage in a comparison of Aegis's or ArmorGroup's offered unit prices to the unit prices in the Independent Government Estimate (the "IGE").  Instead, the JCC-I/A multiplied the quantities contained in the IGE by the monthly unit prices proposed by each offeror on each CLIN.  According to plaintiff, this shows that the record lacked a meaningful price realism analysis.  Plaintiff's operating premise that a particular analysis was required is not correct.  The FAR does not require agencies to use IGE estimates to determine price realism at all; in fact, it does not direct agencies to use any particular tool in a price realism analysis.  Instead, the FAR suggests that "independent government cost estimates" may be used in a price analysis comparison to determine price reasonableness, not price realism.  FAR 15.404-1(b)(2)(v).  In any case, consistent with the latitude accorded the agency requesting proposals, the JCC-I/A structured its solicitation requirements such that offerors would provide sufficient information for the JCC-I/A to render a rational price realism analysis.  See Labat-Anderson, 50 Fed. Cl. at 106 ("[T]he nature and extent of an agency's price realism analysis are matters within the agency's discretion.").

Similarly, the JCC-I/A engaged in a price reasonableness analysis that was separate from its price realism analysis, and this price reasonableness analysis was sufficient.  Whereas the purpose of price realism analysis is to ensure that an offeror understands the solicitation requirements and actually can perform those requirements prescribed in the PWS in the manner that it proposes, the purpose of price reasonableness analysis is to ensure that the offeror's price is not unreasonably high or unreasonably low.  The RFP directed the JCC-I/A to engage in separate price realism and price reasonable analyses.  Plaintiff sees the fact that the price analysis worksheet  was used in both the JCC-I/A's price realism and price reasonableness analyses as evidence that the two analyses were not performed separately.  The record does not support this citation of error.  The price analysis worksheet merely was a tool used by the SSA and Contracting Officer to organize intelligently the data provided by the offerors.  Price realism and price reasonableness are two different analyses, but they necessarily use the same underlying pricing data when applied to a given proposal.  The

20

second determination of the competitive range reflects that the SSA engaged in both price realism and price reasonableness analyses and that these analyses were performed separately.

According to the FAR, one tool to be used in price reasonableness analysis is the "[c]omparison of proposed prices received in response to the solicitation.  Normally, adequate price competition establishes price reasonableness."  FAR 15.404-1(b)(2)(i) (emphasis added).  Price competition is considered adequate when "[t]wo or more responsible offerors, competing independently, submit priced offers that satisfy the Government's expressed requirement," and

> (A) [a]ward will be made to the offeror whose proposal represents the best value . . . where price is a substantial factor in source selection; and

> (B) There is no finding that the price of the otherwise successful offeror is unreasonable. Any finding that the price is unreasonable must be supported by a statement of the facts and approved at a level above the contracting officer.

FAR 15.403-1(c)(1)(I).  In this procurement multiple responsible offerors were competing independently for a negotiated procurement; all of the proposals satisfied the Government's expressed requirements; and five of them were found to have reasonable prices.  This is sufficient for a rational price reasonableness analysis.

The record reflects that the JCC-I/A engaged in separate price realism and price reasonableness analyses that were rational and that it performed them pursuant to the RFP's requirements.

## 2) The comparative price evaluation was meaningful

Even if the methodologies for the price reasonableness and price realism analyses were rational, plaintiff alleges that the JCC-I/A's price evaluation was "irreparably flawed" because it did not take in to account the varying number of labor hours that each offeror proposed in a CLIN unit.  See Pl.'s Br. filed Aug. 17, 2007, at 5-9.  Plaintiff states accurately, that the contract was an "Indefinite Delivery/Indefinite Quantity (IDIQ) contract" with "Fixed Price Labor Rate task orders."  Pl.'s Br. filed Aug. 17, 2007, at 5; AR Tab 4 at 105.  Offerors were directed to propose unit prices for each CLIN, for which the relevant unit was a labor "[m]onth."  See AR Tab 4 at 101-05.  The JCC-I/A was to purchase needed quantities of labor based upon the awardee's proposed monthly rate.  Plaintiff asserts that the RFP, however, never defined the "number of hours that should be included in calculating an FTE in the technical proposal or in calculating a 'quantity' of 1 in the price proposal."  Pl.'s Br.

filed Aug. 17, 2007, at 5.  Each offeror was directed to provide, in its Technical Approach Proposal, detailed information about its staffing plan "that clearly depicts the total number of productive labor-hours and associated full-time equivalent (FTE) positions for each proposed labor category crosswalk to each third-level PWS paragraph in the PWS." AR Tab 4 at 129.  Each offeror, in its Technical Approach Proposal, then, identified the total number of productive labor-hours that it expected from a given position on a CLIN by CLIN basis. See, e.g., AR Tab 61 at 3425-34 (plaintiff's proposal contemplated between [         ] productive labor-hours per year for each CLIN); AR Tab 16 at 1161 (Aegis's proposal contemplated average of [    ] productive labor-hours per year for each CLIN); AR Tab 17 at 1529-30 (ArmorGroup's proposal contemplated between [          ] productive labor-hours per year for each CLIN).

On this basis plaintiff contends that JCC-I/A's comparison of unit prices did not take into consideration the amount of "hours" that each CLIN ordered would provide.  Pl.'s Br. filed Aug. 17, 2007, at 8.  This deficiency precluded the JCC-I/A from "adequately [comparing] offerors' unit or ceiling prices without an assessment of the different meanings regarding 'quantity' in each offeror's price proposal." Id.  Actually, plaintiff's position reflects a misunderstanding of the type of contract for which the JCC-I/A was soliciting.  It is true that in a standard time-and-materials or labor-hour contract, the relevant rate of labor is an hourly rate.  See FAR 16.601(a); FAR 16.602.  The RFP for the Solicitation, however, proposed an ID/IQ contract with "Fixed Labor Rate task orders."  AR Tab 4 at 126.  As a consequence, the JCC-I/A was not soliciting bids for an hourly labor rate, but, rather, soliciting a number of units on a position-by-position basis for a month at a time: when the agency hired one Security Escort Team (CLIN 1022AA), AR Tab 4 at 103, it was not hiring one individual who would work a certain number of productive-labor hours; it was securing a guarantee from the offeror that the position would be fulfilled according to the PWS. 6/

---

6/ During arguments, defendant's counsel elaborated:

With regards to the question of their analysis of hourly rate.  The problem with that entire argument is that the government was not in the solicitation buying hourly rates.  It was not buying hourly services.  This is a fixed price contract based upon monthly units.  The government had said that it was going to base its comparison upon the unit prices, in other words the monthly units in the RFP.

We know this from looking at the question, not only from the RFP, but it's clarified in the second question and answer session, questions 49 and 50 in the administrative record.

Understood this way, in order to engage in a meaningful apples-to-apples comparison of each offeror's unit prices, the JCC-I/A was not required to compare the different productive labor-hours associated with a particular offeror's unit prices for a given CLIN. The JCC-I/A was not buying productive labor-hours at all – it was buying fulfillment of positions per the PWS. The number of productive labor-hours that a given offeror proposed for a CLIN unit was certainly relevant in evaluating that offeror's technical ratings. Moreover, the JCC-I/A likely considered this number in evaluating the price realism and reasonableness of a given proposal. However, this has no bearing on the rationality and reasonableness of the JCC-I/A's comparative price evaluation. The RFP required that the SSA compare "unit prices, total proposed prices, performance incentive rates and maximum performance incentive amounts, for the basic performance period and all option periods." AR Tab 4 at 139. The SSA did exactly this. 7/

_____

6/ (Cont'd from page 22.)

So the government doesn't care as much how much it's staffed, so long as it's staffed in a way that meets the performance work statements requirements.

Tr. at 41-42; see AR Tab 9 at 516 (second round of questions and answers between JCC-I/A and prospective offerors). Counsel for Aegis echoed this understanding of the contract. As a matter of contract interpretation, both defendant and Aegis are correct.

We're simply providing whatever personnel are required to fill this position 24 hours a day, seven days a week, taking into account breaks, whatever the level of service that's required to do it, relief for meals. In other words, you don't send a guard out there and say, okay, if the person is on break or taking a meal, then the position is not being filled. It has to be filled 24 hours a day with no breaks, so however many people it takes to do that. If you can do it with two people, shifting them back and forth, that's fine. If it takes three, then that's what it takes.

Tr. at 94-95.

7/ Plaintiff's argument could be construed as a challenge to the RFP's evaluation scheme on one of two grounds. Plaintiff might be suggesting that the fact that offerors themselves proposed quantities was an inappropriate means to structure a solicitation. Alternately, plaintiff might be framing a challenge that a solicitation that compared units of Fixed Labor Rate task orders instead of hourly labor rates was inappropriate. Inasmuch as

### 3) The JCC-I/A's treatment of incentive fees was not proper, but did not prejudice plaintiff.

The JCC-I/A recognized that certain aspects of its solicitation required the utmost level of care and performance. It acknowledged that "[a] margin of error may be tolerable in a normal operating environment," but that "the contractor will be performing services in a combat zone with higher overall risk." AR Tab 4 at 118. In particular, the JCC-I/A noted that

> [c]ertain areas of risk are considered to be highest; where the consequences of failure are loss of life due to unsafe acts or inaccurate threat assessments. In these high risk areas, the standard of performance cannot be less than 100%; in effect a zero tolerance for failure to meet the standard.

Id. To help encourage offerors to meet this high level of performance, the contract included, in section H.10, a "Risk Incentive Plan." Id. Under the terms of this plan, offerors were directed to propose incentive rates and maximum incentive amounts for the CLINs corresponding to Security Escort Team Members and Reconstruction Liason Team Members – those security personnel that would be responsible for guarding GRD units engaging in active operations. Id. at 119. Performance would be evaluated every month during the base year and every quarter during the option year. If the awardee met a 100% standard of performance for these CLINs for a given period, it would receive a payment of the performance incentive amount, calculated by

> multiplying the applicable performance incentive rate by the invoiced amount for the applicable CLIN for the performance period. No performance incentive

---

6/ (Cont'd from page 23.)

plaintiff's argument could be construed as the latter challenge to the terms of the solicitation, it is not timely. The Federal Circuit established that challenges to the terms of a solicitation must be raised prior to the closing date for receipt of proposals. See Blue & Gold Fleet, L.P. v. United States, ___ F.3d ____, 2007 WL 1815678, at *3 (Fed. Cir. 2007) ("We also hold that a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.").

will be calculated if the performance incentive amount will exceed the maximum performance incentive amount. Performance incentive will be payable at the end of the base contract (ID/IQ) period of performance and at the end of the option period (as applicable).

Id.

Offerors were to propose incentive rates and maximum incentive amounts as CLINs 0010, 0011, 1010, and 1011. ArmorGroup, as an example, proposed an incentive rate of [] for each of these four CLINs. Plaintiff took a different approach. In its price proposal file, it took exception to these performance incentives because it "view[ed] this underlying commitment as a [   ] and therefore not subject to the [                                    ]." AR Tab 66 at 3633. Although it planned "fully and actively [to] participate in the Quality Assurance Surveillance Plan in conjunction with" the JCC-I/A and GRD, plaintiff advised that it did not need a performance incentive to encourage it to maintain a 100% performance rate, and so it declined such an incentive. See id. at 3640 (proposing "[  ]" for incentive rate and [                                    ] amount in all four relevant CLINs).

Plaintiff entered [    ] for these CLINs, pursuant to section L.10.3.3. of the RFP, which instructed offerors on how to complete section B of the contract, the pricing table to be included in their pricing file:

> Section B (Supplies or Services and Price/Costs) - SECTION B shall be submitted fully completed and error free. It shall contain the offeror's prices performance incentive rates and maximum performance incentive amounts for the established Contract Line Item Numbers (CLINS) set forth in that section.

> The offeror is cautioned to complete all blanks to identify any CLIN not priced as "Not Separately Priced" or "N/A" as applicable.

AR Tab 4 at 133. Plaintiff noted its exception to the performance incentive rate pursuant to section L.10.3.1. of the RFP, which instructed offerors to include in their price files "[an] [i]dentification and explanation of any exceptions or deviations." Id.

The JCC-I/A, in its second comparative range determination, did not agree with Erinys's interpretation. It elaborated:

> Erinys'[s] proposal contained a major deficiency: failure to accept all the terms and conditions of the RFP by refusing to propose performance

25

incentives. Erinys'[s] price proposal took exception to the government's Risk Incentive Plan outlined in clause H.10 In Erinys'[s] Price Proposal Volume VI.1.2, Erinys in their own words "[

].'' By taking exception to a mandatory provision in the solicitation Erinys makes their proposal unawardable absent a modification to the solicition on the part of the government or an opportunity to amend their proposal . . . .  Erinys was excluded from the competitive range because their proposal is unawardable without modifying the solicitation or a significant change to their proposal.

AR Tab 41 at 2835.

Plaintiff asserts that the RFP allowed an offeror to take exception to a term pursuant to section L.10.3.1. of the RFP and that it was allowed to fill the performance incentive CLINs with "n/a" because it was not separately pricing them; indeed, plaintiff was not pricing them at all.  The JCC-I/A instead views this approach to pricing an incentive fee as a major deficiency.  Curiously, the JCC-I/A did not make the same finding during the first competitive range determination, even though nothing in plaintiff's proposal nor the solicitation changed, and the performance incentive was not the subject of any aspect of Erinys I.

More curious still, Aegis also failed to propose an incentive rate.  It completed the incentive rate portion of CLINs 0010, 0011, 1010, and 1011, as follows: "[

].'' AR Tab 16 at 1456.  Aegis expressed a view on the performance incentives similar to plaintiff's: "Aegis believes it must always achieve a 100% record in support of the safety and security of Government employees as well as its own staff."  While Aegis did not take exception to any portion of the RFP in its pricing file, it did not propose an incentive rate, either, instead completing that CLIN block with an "[ ]" value.  In its explanation in section 6.4.1. of its price file, Aegis made an alternative proposal to insert a price:

> Aegis fully accepts and supports the concept of Performance Based Acquisition and appreciates the goals and objectives set out in this acquisition strategy as employed by the USACE on the RSSS Solicitation.

> However on the basis that Aegis believes it must always achieve a 100% record in support of the safety and security of Government employees as well as its own staff Aegis proposes an alternative approach, which it believes is entirely in the spirit of an incentive based scheme.

Aegis would like to suggest that if the Government is satisfied, on a quarterly review of overall performance, that its mission is being enhanced and achieved through Aegis's direct contribution that the Government considers [

].  This would allow more of the [
], currently being implemented to be funded [


].  If, under the FAR the Government is obliged to pay such monies to Aegis direct, Aegis commits itself to [               ] into the Aegis [                        ] fund as designated funds to be [
] in support of Reconstruction.

Id. at 1457.  In the second competitive range determination, the SSA did not consider Aegis's failure to propose an incentive rate to be a deficiency.

The SSA's narrative suggests that the incentive rate was a mandatory term in that the RFP absolutely required offerors to propose an incentive rate.  If this is the case, neither plaintiff nor Aegis proposed an incentive rate, and so it was arbitrary and capricious to find plaintiff deficient for failing to propose an incentive rate, but not to find Aegis deficient for doing the same.  In the alternative, if the term is not mandatory, and plaintiff properly excepted to the term and filled the performance incentive rate with "n/a", the JCC-I/A had no rational basis to find plaintiff deficient for doing so, while finding Aegis not deficient. The incentive rate term is either a mandatory term or it is not a mandatory term. In either case, however, the SSA's action remained arbitrary, capricious, and without rational basis.

In order to succeed on the merits, plaintiff would have to show that not only was this action arbitrary and capricious or without rational basis, but also that it prejudiced plaintiff. Under the circumstances, while the SSA's description of plaintiff's proposal as deficient was maladroit, the record indicates that it did not prejudice plaintiff in any way.  As noted earlier in section II.3.1), supra, the SSA acknowledged that it excluded plaintiff from the competitive range solely based on price.  For this reason the record reflects that plaintiff did not suffer prejudice from the SSA's arbitrary and capricious treatment of the incentive rates. 8/

---

8/  Even assuming, arguendo, that the incentive rate was a mandatory term, the absence of a mandatory term does not necessarily requires exclusion from the competitive range.  If the term is considered mandatory, Aegis's proposal, for example, would be deficient in the sense that Aegis could not be awarded the contract as it stands.  However, deficiencies only preclude award of the contract, not exclusion from the competitive range. Once included in the competitive range, such minor deficiencies are the subject of discussions between the agency and an offeror.  See FAR 15.306(d); see also II.2. supra.

III.   Other factors to support an injunction

Besides (1) success on the merits, injunctive relief requires a plaintiff to demonstrate that (2) it will suffer irreparable harm if injunctive relief is not granted; (3) the harm to plaintiff if an injunction is not granted outweighs the harm to the Government if an injunction is granted; and (4) the injunction is not against the public interest. PGBA, 389 F.3d at 1228-29; FMC, 3 F.3d at 427.

Plaintiff has shown irreparable harm. "An action at law only allows recovery of 'bid preparation costs in a suit for damages, but not loss of anticipated profits,' leaving a bid protestor irreparably harmed." Bannum Inc. v. United States, 60 Fed. Cl. 718, 730 (2004) (quoting Essex Electro Eng'rs, Inc. v. United States, 3 Cl. Ct. 277, 298 (1983), aff'd, 757 F.2d 247 (Fed. Cir. 1985)).  The balance of harms, however, weighs in favor of the JCC-I/A and Aegis, which should not be delayed when plaintiff has no chance of success on the merits. 9/

Finally, the court must consider whether an injunction would be in the public's interest. This determination implicates matters of national defense and national security in providing relief.  28 U.S.C. § 1491(b)(3) ("[T]he court[] shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action.") The Federal Circuit had occasion to consider the meaning of 28 U.S.C. §1491(b)(3) in PGBA, 389 F.3d 1219, concluding that "section 1491(b)(3) merely instructs courts to give due regard to the issue of national defense and national security in shaping relief." Id. Defendant has made no showing on point.

Considering the public interest in the context of awarding government contracts, however, plaintiff has not proved that an injunction would be in the public interest. The JCC-I/A made a rational decision that complied with all applicable regulations and excluded plaintiff from the competitive range based on price considerations.  Moreover, defendant has shown that consolidating the two existing RSSS contracts could provide "economies of scale for indirect costs such as safety, training, QA, HR, logistics, etc." AR Tab 1 at 8.  The JCC-I/A also predicted that consolidating the contracts would allow for easier administration of the reconstruction security support services and that "[f]ull and open competition [between offerors] may realize some reduction from current prices." Id.  Plaintiff quibbles with this

---

9/  During oral argument, defendant conceded that "the government is in a position to cover the contract if the need be.  To basically cover, if there's an injunction and the solicitation needs to be redone, the government can cover these services."  Tr. at 57.

position, but the court deems the agency acted reasonably and expects, as a general proposition, economies of scale in consolidating the two contracts, especially when the new format is fixed-price, not time-and-materials.  The proposals by Aegis and ArmorGroup selected for inclusion in the competitive range are significantly less costly than plaintiff's.

## CONCLUSION

Based on the foregoing, defendant's and Aegis's cross-motions for judgment on the administrative record are granted, and plaintiff's cross-motion for judgment on the administrative record is denied.  Accordingly,

1.  The Clerk of the Court shall enter judgment for defendant and intervenor Aegis.

2.  By September 12, 2007, the parties shall identify by brackets any material subject to redaction before the opinion issues for publication.

**IT IS SO ORDERED**.

No costs.

s/ Christine O.C. Miller

_____
**Christine Odell Cook Miller**
Judge